Gleniss S. SCHONHOLZ,
Plaintiff–Appellant,

v.

LONG ISLAND JEWISH MEDICAL
CENTER, Defendant–Appellee.

No. 234, Docket 95–7269.

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1995.

Decided June 26, 1996.

Anthony M. Radice, New York City (William E. Zuckerman, Morrison & Foerster, New York City, on the brief), for Plaintiff–Appellant.

Charles G. Moerdler, New York City (Albert M. Appel, Sandra Jefferson Grannum, Robert C. Kern, Jr., Strook & Strook & Lavan, New York City, on the brief), for Defendant–Appellee.

Before: MESKILL, MAHONEY and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Plaintiff Gleniss S. Schonholz appeals from a judgment of the United States District Court for the Eastern District of New York (John R. Bartels, *District Judge*) in favor of defendant Long Island Jewish Medical Center ("LIJ") in her suit for severance benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* For the reasons stated below, we affirm in part, vacate in part, and remand.

## BACKGROUND

On May 3, 1991, Dr. Robert K. Match, then-President of LIJ, announced in a memorandum to senior employees the details of a severance pay program (the "Severance Plan") that provided for payments to senior-level employees upon their involuntary discharge. Payments under the Severance Plan were to be based upon both the length of time the employee held his position and his prospects for reemployment, but they would be made only if the employee displayed a reasonable and good faith effort to obtain a position commensurate with his former level of responsibility. In addition, the employee would not be eligible for payments under the Severance Plan if the termination was for either illegal conduct or substantially deficient performance. The Severance Plan provided that the terminated employee would continue to receive other benefits, and contained no provision for its termination or amendment. Apart from those discussed below, LIJ neither created nor circulated any documents purporting to amend, modify, or terminate the Severance Plan.

Schonholz was Senior Vice President and Chief Operating Officer of LIJ between 1987 and April 1, 1993. Schonholz's departure was precipitated by continuing disagreements in late 1992 between Schonholz and Irving Schneider, who at the time was Chairman of LIJ. Sometime between December 10 and December 18, 1992, Match informed Schonholz that he was going to ask for her resignation in the near future. Schonholz agreed that she would submit her resigna-

tion, to be effective April 1, 1993. This request was formalized in a letter from Match to Schonholz, dated December 18, 1992, which also stated:

> Of course, the terms of your severance will be governed by the LIJ Medical Center personnel policies applicable to members of the President's Council, including the Severance Pay Program dated May 3, 1991. At your option, the initial twelve months of severance pay may be taken in one lump-sum payment on the day of your termination or bi-weekly over the twelve months after your termination.
>
> Please arrange to meet with the Vice-Presidents of Finance and Human Resources to discuss and arrange the details.

The letter indicated that Match's request was due to changes in hospital management connected with his upcoming retirement and was unrelated to Schonholz's performance of her duties. In compliance with the request contained in the December 18 letter, Schonholz formally submitted her resignation, effective April 1, 1993, in a letter dated December 22, 1992.

On March 23, 1993, LIJ's Board of Trustees first became aware of the Severance Plan, the December 18 letter, and the December 22 letter. At a meeting that day, the Board of Trustees voted to revoke the Severance Plan. Match told Schonholz about the Board's decision the next day, March 24, and added that he thought that she would be contacted by LIJ shortly to discuss her severance arrangements. On March 29, Match wrote Schonholz to the effect that the Board had never approved or adopted the Severance Plan, that the Severance Plan was "deemed invalid and null and void and never to have been effective," and that LIJ was not bound by the Severance Plan's provisions. In the letter, Match made no mention of alternative severance arrangements for Schonholz. No one from LIJ contacted Schonholz thereafter about her situation.

On June 11, 1993, Schonholz commenced this ERISA action below against LIJ and several individuals. LIJ and the other defendants moved to dismiss the case for failure to state a claim. In a memorandum and

order, the district court dismissed the claims against the individual defendants without leave to amend, dismissed the ERISA-based promissory estoppel claim against LIJ with leave to amend, and struck the request for punitive damages. *Schonholz v. Long Island Jewish Medical Ctr.*, 858 F.Supp. 350 (E.D.N.Y.1994) (*"Schonholz I"*).

Following discovery and the filing of an amended complaint, LIJ and Schonholz cross-moved for summary judgment. The district court held that the Severance Plan was an employee welfare benefit plan within the meaning of ERISA, and that therefore federal subject matter jurisdiction existed. *See Schonholz v. Long Island Jewish Medical Ctr.*, 889 F.Supp. 610 (E.D.N.Y.1995) (*"Schonholz II"*). However, the district court held that Schonholz's claims under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), were without merit as a matter of law. From this ruling Schonholz now appeals.

On appeal, Schonholz challenges the grant of summary judgment in LIJ's favor on the ERISA claims, and LIJ argues that the district court erred in finding subject matter jurisdiction. We turn to the jurisdictional issue first.

## DISCUSSION

### I. *ERISA Subject Matter Jurisdiction*

■ ERISA grants federal district courts concurrent jurisdiction over all claims by an "employee welfare benefit plan" beneficiary who seeks to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) & (e)(1). LIJ contends that the Severance Plan does not constitute an employee welfare benefit plan under ERISA and that, therefore, the district court lacked

subject matter jurisdiction over Schonholz's claims.

The term "employee welfare benefit plan" is defined by ERISA to include

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries ... (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services.

29 U.S.C. § 1002(1); *see* 29 U.S.C. § 1002(3). Because the district court held that the Severance Plan was within the definition of "employee welfare benefit plan" and thus determined jurisdiction as a matter of law, we review its finding de novo. *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1016–17 (2d Cir.1991).[1]

The term "employee welfare benefit plan" has been held to apply to most, but not all, employer undertakings or obligations to pay severance benefits. Yet, both the Supreme Court and this court have emphasized that ERISA applies only where such an undertaking or obligation requires the creation of an ongoing administrative program. For instance, in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12, 107 S.Ct. 2211, 2218, 96 L.Ed.2d 1 (1987), the Supreme Court, faced with whether ERISA preempted[2] a Maine statute that required employers to make a one-time severance payment to employees upon a plant closing, held that the Maine statute did not create an employee welfare benefit plan and thus was not preempted. The Court stated: "The theoretical possibility of a one-time obligation in the future simply creates no need for an

---

1. LIJ did not cross-appeal from the district court's decision. Nonetheless, because we may raise the issue of subject matter jurisdiction *sua sponte, United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir.1994), we reach LIJ's argument.

2. Section 514(a) of ERISA, 29 U.S.C. § 1144(a), states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any" employee welfare benefit plan. Thus, if the federal courts have jurisdiction over claims for recovery from a benefit plan, state law is preempted as to that plan.

ongoing administrative program for processing claims and paying benefits." *Id.*

Similarly, in *James v. Fleet/Norstar Financial Group, Inc.,* 992 F.2d 463 (2d Cir. 1993), we addressed whether an employer's undertaking to give employees severance pay was an employee welfare benefit plan. The employer had announced that one of its offices would be closed but told the workers in that office that, if they stayed on until the closing, they would receive sixty-days additional pay. In our view, the employer's promise did not constitute an employee welfare benefit plan because "the nature of the payments did not require an ongoing administrative employer program to effectuate them." *Id.* at 467. Other courts have reached a similar conclusion. *See, e.g., Belanger v. Wyman–Gordon Co.,* 71 F.3d 451, 454 (1st Cir.1995) (ERISA implicated only if there are "continuing administrative and financial obligations"); *Simas v. Quaker Fabric Corp.,* 6 F.3d 849, 853–54 (1st Cir.1993) (courts do not apply *Fort Halifax* where the state statute or employer promise creates "ongoing obligations"); *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1323 (9th Cir.1992) (adopting approach that ERISA requires "administrative scheme"), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993); *Fontenot v. NL Indus., Inc.,* 953 F.2d 960, 962–63 (5th Cir.1992) (same); *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3d Cir.1989) (same).

But while it is plain that ERISA subject matter jurisdiction depends upon the need for an administrative program, the test for deciding which employer obligations and undertakings require such a program is opaque. *See Simas,* 6 F.3d at 854. In *James,* although the employer's payments to its employees would have to be calculated individually (because the circumstances of each employee differed as to eligibility, termination, and deductions), we said that the "need to make such simple arithmetical calculations did not" mean that the severance payment program was an employee welfare benefit plan. 992 F.2d at 467. However, deciding what is not an ongoing administrative program does not aid our determination of which obligations are complex enough to require such a program.

Other courts facing this same issue have looked to a variety of factors, including whether the employer's undertaking or obligation requires managerial discretion in its administration, *Bogue,* 976 F.2d at 1323; whether "a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits," *Belanger,* 71 F.3d at 455; and whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria, *Fontenot,* 953 F.2d at 963 (citing *Pane v. RCA Corp.,* 667 F.Supp. 168, 170–71 (D.N.J.1987), *aff'd,* 868 F.2d 631 (3d Cir.1989)). We need not decide today which one or more of these factors will be determinative in every case because, in this case, we conclude that all of them favor Schonholz. *Cf. Belanger,* 71 F.3d at 455 ("There is no authoritative checklist that can be consulted to determine conclusively if an employer's obligations rise to the level of an ERISA plan.").

The Severance Plan required much more than the simple arithmetical calculations we held to be insufficient in *James.* The Severance Plan necessitated both managerial discretion and a separate analysis of each employee in light of certain criteria. LIJ would have had to determine whether the employee was involuntarily terminated, and thus qualified for the Severance Plan; whether the termination was for either illegal conduct or substantially deficient performance; whether the employee was making a reasonable and good faith effort to obtain suitable employment elsewhere; and whether, if other employment had been found, it was commensurate with the employee's former organizational level and scope of responsibility.

There is also little doubt that a reasonable employee would have believed that the Severance Plan evidenced an ongoing commitment to provide severance benefits. Unlike the employer's obligation in *Fort Halifax* and the promise in *James,* the Severance Plan was not limited either to a single payment or to a short span of time upon a plant or office closing. The Severance Plan's effective peri-

od was unlimited and would have reasonably been perceived by an employee as an ongoing commitment. *Cf. Belanger*, 71 F.3d at 455 (finding no such commitment). Because all factors point to a finding that the Severance Plan is covered by ERISA, we affirm the district court's holding that it had subject matter jurisdiction.

## II. *ERISA Claims*

Schonholz alleges that LIJ's refusal to pay her severance benefits violated § 1132(a)(1)(B) under two theories. Schonholz's first theory is that LIJ's December 18 letter and her December 22 response created a binding contract that vested her benefits. Her second theory is that LIJ was barred by promissory estoppel from denying her benefits.

The district court based its grant of summary judgment upon its belief that the letters between Schonholz and Match could not result in contractual vesting because they were only "informal communications" and not formal plan documents. In addition, the district court found that Schonholz's promissory estoppel claim failed because she could not demonstrate any injury.

■ It is well-settled that our review of the grant of a summary judgment motion is de novo, and reversal is required if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir.1996). Because we find that genuine issues of material fact do exist as to both theories advanced by Schonholz, we vacate the district court's order and remand for further proceedings.

### A. *Contractual Vesting*

■ Under ERISA it is the general rule that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time. *Reichelt v. Emhart Corp.*, 921 F.2d 425, 429–30 (2d Cir.1990), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991). Nothing in ERISA, however, forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan, and several of our sister circuits have held that such agreements or waivers will be enforced. For instance, the Seventh Circuit has held that an agreement to vest employee welfare benefits will be upheld. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 604–05 (7th Cir.) (en banc), *cert. denied*, 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *see id.* at 616 (Easterbrook, J., dissenting) (agreeing that parties may elect to vest employee welfare benefits by contract); *see also Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.) (employer may waive right to modify or terminate a plan), *cert. denied*, 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993); *Anderson v. John Morrell & Co.*, 830 F.2d 872, 876–77 (8th Cir.1987) (employer may, under certain conditions, contract to vest employee welfare benefits); *In re White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir.1986) (same). We agree that there is nothing in ERISA preventing an employer from contracting to vest employee welfare benefits.[3]

■ Not all undertakings by an employer to provide employee welfare benefits result in vesting, however. We previously have noted that ERISA was designed to "ensure[ ] that plans be governed by written documents filed under ERISA's reporting requirements and that [summary plan descriptions], drafted in understandable language, be the primary means of informing participants and

---

**3.** LIJ argues that Schonholz never asserted a contractual vesting argument below and that it is therefore barred on appeal. Amended Brief for Defendant–Appellee at 33. We disagree. The allegations in Schonholz's amended complaint can be read to set forth exactly such a theory even if it was not explicitly argued in the district court. In any event, we are not prevented from considering a new legal theory on appeal if, as with Schonholz's contractual vesting theory, we are not required to engage in additional factfinding. *See Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir.1996).

beneficiaries." *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988). Courts that have allowed contractual vesting have required, at a minimum, that the employer's intent to vest the benefits be contained in a written document, although the employer's intent need not be stated unambiguously. *See Bidlack*, 993 F.2d at 608 (benefits could be vested by ambiguous language in a collective bargaining agreement when supported by extrinsic evidence); *Anderson*, 830 F.2d at 877 (rejecting oral "policy" statement as evidence of vesting of benefits and requiring instead a specific, if not written, expression of employer's intent to be bound). Other courts have gone further, requiring that the employer's decision to vest benefits be set forth clearly in the plan documents. *See Wise*, 986 F.2d at 937; *see also In re White Farm*, 788 F.2d at 1193 ("[T]he parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated."). LIJ contends that because the alleged contractual vesting was not part of any "formal plan documents," Schonholz's claim must fail.

In each case cited by LIJ for the proposition that vesting must be included in formal plan documents, the employer had created such documents and distributed summary plan descriptions to the employees. But, in this case, LIJ created no such formal documents for the Severance Plan and, as LIJ notes, Department of Labor regulations do not require that the Severance Plan be maintained with the same level of formality that is required of most other employee welfare benefit plans. *See* 29 C.F.R. § 2520.104-24(a)(1). To require that LIJ's decision to vest the Severance Plan be included in the "formal plan documents," would also mean that LIJ and its employees would have to have memorialized that decision by amending formal plan documents that do not exist.

■ The Supreme Court has clarified that such an adherence to formalities is not mandated by the statute. Instead, "ERISA ... follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amend-ment procedure or elsewhere, it is bound to that level." *Curtiss–Wright Corp. v. Schoonejongen*, —— U.S. ——, ——, 115 S.Ct. 1223, 1231, 131 L.Ed.2d 94 (1995). Therefore, any agreement to vest Schonholz's benefits would only have to be memorialized at the same level of formality that LIJ chose in promulgating the Severance Plan in the first place. In this case, the alleged promise was memorialized not in a formal plan document, but in the 1991 memorandum that Match sent to senior employees. We easily conclude that the December 18 and December 22 letters are at least as formal as the 1991 memorandum and that, therefore, the district court erred in concluding that Schonholz's claim is barred because "Match's letter is not a formal plan document." *Schonholz II*, 889 F.Supp. at 614.

We also disagree with the district court's holding that LIJ's commitment to vest Schonholz "must be in 'precise language denying the right to withdraw benefits.'" *Id.* at 615 (quoting *Wise*, 986 F.2d at 938). We do not think, at least in this case, that Schonholz is required to point to unambiguous language to support her claim. *See Bidlack*, 993 F.2d at 608–09. It is enough if she can point to written language capable of reasonably being interpreted as creating a promise on the part of LIJ to vest her severance benefits. Because the December 18 letter may be so interpreted by a trier of fact, we remand the contractual vesting claim to the district court.

### B. *Promissory Estoppel*

■ We have previously held that the principles of estoppel can apply in ERISA cases under extraordinary circumstances. *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993). The Second Restatement of Contracts defines promissory estoppel as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance." Restatement (Second) of Contracts § 90(1) (1979). The Restatement further provides that such a promise is enforceable "if injustice can be avoided only by enforcement of the promise." *Id.* The

First Restatement's formulation was similar: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of Contracts § 90 (1932); *see also* 28 Am.Jur.2d *Estoppel & Waiver* § 48 (1966) ("[A]n estoppel may arise from the making of a promise ... if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would ... result in ... injustice.").

▮ The basic elements of promissory estoppel therefore are (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced. LIJ argues, however, that to prevail, Schonholz must show that the promise contained in the first element is clear and unambiguous. It is true that New York law requires a clear and unambiguous promise, *see, e.g., Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir.1996) (applying New York law), but courts elsewhere in this circuit, relying on the Restatement, have formulated the first element in a different manner. The Supreme Court of Connecticut has required only the existence of "a clear and definite promise," *i.e.,* one which if "judged by an objective standard," the defendant had reason to expect reliance by the plaintiff. *D'Ulisse–Cupo v. Board of Directors of Notre Dame High Sch.*, 202 Conn. 206, 213, 520 A.2d 217 (1987). The Supreme Court of Vermont has articulated the test as whether the plaintiff has shown a promise which the promisor should reasonably expect to induce reliance. *Stacy v. Merchants Bank*, 144 Vt. 515, 521, 482 A.2d 61 (1984). Outside this circuit, the New Jersey Appellate Division has similarly required only "a clear and definite promise made with the expectation that the promisee will rely." *Spaulding v. Hussain*, 229 N.J.Super. 430, 438, 551 A.2d 1022 (App.Div.1988).

▮ ERISA is a federal law regime for regulating employee benefits designed to eliminate the threat of conflicting state and local regulation of benefit plans. *Fort Hali-*

*fax,* 482 U.S. at 9, 107 S.Ct. at 2216. We are not bound by New York law and therefore see no reason to apply New York's formulation of the first element of promissory estoppel. In accordance with the unifying theme of the statute, we prefer the language of the present Restatement and require, for purposes of ERISA, only that Schonholz demonstrate a promise that LIJ reasonably should have expected to induce action or forbearance on her part. Under this standard, we conclude that a trier of fact reasonably could conclude that Schonholz has met her burden on the "promise" element: a jury properly could infer from the December 18 letter a promise on which LIJ should have expected that Schonholz would rely in tendering her resignation.

We have no difficulty in concluding that Schonholz has shown evidence of the second element of promissory estoppel——reliance on the alleged promise. Schonholz's submission of her resignation just four days after the December 18 letter is, by itself, enough to create a triable issue as to reliance.

We also part company with the district court's finding that Schonholz is unable to demonstrate injury based on her reliance. *Schonholz II,* 889 F.Supp. at 615. Although LIJ was free to terminate the Severance Plan at any time absent any promise to vest Schonholz, that fact alone is not enough to defeat Schonholz's claim. If LIJ had not transmitted the December 18 letter, Schonholz might never have submitted her resignation. LIJ then would have had to choose between firing Schonholz and keeping her on for an undetermined period. Each option presumably entailed disadvantages to LIJ because LIJ chose neither. For instance, firing Schonholz might have affected employee morale at LIJ and could have led to a very abrupt and turbulent transition from Schonholz to a new Chief Operating Officer, while permanent retention of Schonholz would most probably have resulted in a continuation of the same antagonism between Schonholz and Schneider that had precipitated the decision to ask for Schonholz's resignation in the first place. In other words, by agreeing to leave amicably, Schonholz conferred a benefit on LIJ, one that may be

quantifiable. If Schonholz's cooperation until the end of March 1993 had been of no value to LIJ, Schonholz might have been terminated without any bargaining. Just as a benefit to LIJ is implicit in the bargaining that led to Schonholz's submission of her resignation letter, so also is a corresponding detriment to Schonholz in the form of the power to withhold that benefit——something she gave up, presumably because severance benefits were being offered to her in exchange. It is this possibility of loss that a jury should be permitted to consider as injury to Schonholz in satisfaction of the third element of promissory estoppel.

Finally, we note that Schonholz must show "that enforcement of the promise must be necessary to avoid an injustice, presumably caused by the reliance." 4 Richard A. Lord, *Williston on Contracts* § 8:5 (4th ed. 1992). The district court did not address this element below, but we conclude that if Schonholz is able to prevail on the other three elements of promissory estoppel, she may prevail on this one as well. *Cf. C & K Eng'g Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 11, 151 Cal.Rptr. 323, 587 P.2d 1136 (1978) (task of considering element of injustice is equitable one for court and not jury). Assuming that the jury concludes that LIJ promised to extend Schonholz's benefits, that LIJ should have known that Schonholz would rely, that Schonholz did in fact rely, and that Schonholz was injured by that reliance, it is clear to us that she will be able at least to contend that an injustice would result if the promise is not enforced.

Because we find that there are genuine issues of material fact on this claim, we remand it to the district court.

## CONCLUSION

For the reasons stated above, we affirm the district court's exercise of subject matter jurisdiction, we vacate the district court's grant of summary judgment, and we remand the case for proceedings not inconsistent with this opinion.